IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EMELITA PERALTA
o/b/o FLOYD PERALTA,
      Plaintiff,

vs.                               Case No. 3:04cv279/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) based on consent by the parties to magistrate judge jurisdiction (*see* Doc. 8) .  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commission of Social Security (Commissioner) denying Plaintiff's[1] application for a period of disability and disability insurance benefits under Title II of the Act.

Upon review of the record before this court, it is the opinion of the court that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

_____

[1]This action was brought by Emelita Peralta on behalf of her husband, Floyd Peralta, who died on July 9, 2002 (*see* Doc. 11 at 6).  All references to "Plaintiff" refer to Floyd Peralta.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et. seq*, alleging an onset of disability on November 10, 1985 (Tr. 394).[2] Plaintiff's application was denied initially and on reconsideration (Tr. 398-99, 428-30). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 431-32).  On May 28, 1997, an ALJ rendered a decision finding that Plaintiff was not under a "disability" as defined in the Act (Tr. 20-29).  On February 13, 2001, the United States District Court for the Northern District of Florida reversed the Commissioner's decision and remanded the case to the Commissioner for further development under sentence four of 42 U.S.C. § 405(g) (Tr. 623-27; Peralta v. Massanari, Case No. 3:00cv114/RV/MD).  On September 26, 2001, the Appeals Council remanded the case to an ALJ (Tr. 656-57).  A supplemental hearing was conducted on April 16, 2002, at which Plaintiff was represented by counsel and testified (Tr. 628-49).  A vocational expert ("VE"), Ethel Forrest, also testified at the hearing (Tr. 641-48).  On June 17, 2002, an ALJ found that Plaintiff was not disabled (Tr. 600-08).  On June 19, 2004, the Appeals Council denied Plaintiff's request for review (Tr. 577-79).  Thus, the ALJ's June 17, 2002 decision stands as the final decision of the Commissioner and is therefore subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

## II.     FINDINGS OF THE ALJ

The ALJ found that Plaintiff has not engaged in substantial gainful employment since his alleged onset date (Tr. 606).  He also found that the medical evidence established that Plaintiff had residuals of a mitral valve replacement in 1983, and arthritis with residuals of synovectomy and fusion of the left wrist in 1985 and 1990, but that Plaintiff had no impairment or combination of impairments that met or equaled any impairment listed in 20 C.F.R. Part 404; Subpart P, Appendix 1 (Tr. 602, 607).  The ALJ determined that Plaintiff's complaints of disabling symptoms were not totally credible (Tr. 603-04, 607) and that, during the relevant time period (July 26, 1990 through

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on October 14, 2004 (Doc. 9).

December 31, 1990[3] (Tr. 605)), Plaintiff had the residual functional capacity ("RFC") to:

> lift and carry 20 pounds occasionaly and 10 pounds frequently and to sit or stand/walk each, with routine breaks, for as many as 6 of 8 hours; however, he could not perform work around unprotected heights or moving machinery, or involving climbing or balancing, or more than occasional handling or pushing/pulling with his left hand.  He also needed to avoid exposure to concentrated levels of pulmonary irritants.

 (Tr. 604, 607).  The ALJ further found that Plaintiff had no past relevant work (Tr. 605, 607).  Finally, on the basis of VE testimony, and with Medical-Vocational Rule 202.20 used as a framework for  decision-making, the ALJ found that there were a significant number of jobs in the national economy Plaintiff could perform; thus, he was not disabled within the meaning of the Social Security Act at any time through December 31, 1990 (Tr. 606-07).

III.      STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and is a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d

---

[3]Plaintiff has filed five previous applications for disability.  The only "unadjudicated period of time" is the approximate five-month time frame relevant to this appeal (*see* Tr. 21; Doc. 11 at 3).

842 (1971) (quoting <u>Consolidated Edison Co. V. NLRB</u>, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity and his impairments are not severe, he is not disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment,

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

### A.   Personal and Employment History

Plaintiff was born in the Philippines on February 20, 1945 (Tr. 339, 634).  He was 45 years of age during the time period at issue (Tr. 605).  He attended school in the Philippines through the tenth grade (Tr. 634) and later received a GED from Pensacola Junior College (Tr. 339).  Plaintiff was in the Navy for twenty-one years prior to taking a medical retirement in 1985 (Tr. 394, 631-39).

Plaintiff testified at his hearing before the ALJ on April 16, 2002 as follows.  For the majority of the time he was in the Navy he worked as an engine master (Tr. 638).  He has not been employed since he retired from the Navy in 1985 (Tr. 631).  Plaintiff has very limited use of his left hand, and the problems with that hand began in 1982 or 1983 (Tr. 631-32).  Plaintiff had heart valve replacement surgery in 1983 and since that time tires easily (Tr. 633).  After the valve replacement, Plaintiff performed light duty work for the Navy, such as answering phones, until 1985 when he was medically discharged due to his heart condition (Tr. 633, 639).

Plaintiff testified that in 1990 he suffered from arthritis in his wrist (and underwent wrist surgery sometime prior to 1990), a back problem and dizziness (Tr. 634-36).  He could only stand for approximately thirty minutes at a time before his back hurt, requiring him to either sit or lay down, and he cannot walk very far (Tr. 637).  On an average day in 1990, he spent most of his time laying down due to back pain (Tr. 637-38).

### B.   Relevant Medical History

Plaintiff was initially diagnosed with mild mitral valve stenosis[4] in 1969 (Tr. 155, 161).  He was evaluated in May 1981, found to have good functional capacity, and returned to his usual duty

---

[4]The mitral valve connects the heart's upper-left chamber (atrium) to the heart's lower-left chamber (ventricle).  Mitral Valve Stenosis, available at http://www.mayoclinic.com/invoke.cfm?id=DS00420 (last modified June 3, 2004).  Mitral valve stenosis is a condition in which the mitral valve narrows, which causes the valve to not open properly and to obstruct blood flow between the left chambers of the heart.  Id.

as a Navy engine mechanic (Tr. 155-56, 158).  Plaintiff next underwent cardiac evaluation in January 1983, and despite echocardiographic evidence of mitral stenosis, he demonstrated no deterioration of his physical stamina (Tr. 160).  No restrictions were placed on Plaintiff and he was instructed to follow up in six months (*id.*).  On July 11, 1983, Plaintiff presented to the USAF Hospital in Lakenheath, England with a new onset of atrial fibrillation[5] and congestive heart failure,[6] secondary to mitral stenosis (Tr. 162-63).  He was treated medically, then transferred to Bethesda Medical Center for mitral valve replacement surgery (Tr. 163-64), which he underwent on August 9, 1983 (Tr. 175).  Overall, Plaintiff tolerated the surgery well (Tr. 175-76); however, he remained in atrial fibrillation and required a prolonged hospital admission due to difficulty titrating his dose of Coumadin[7] (Tr. 176).  Plaintiff was discharged on Digoxin[8] and Coumadin (*id.*), and the Naval Medical Board placed him on limited duty for six months (Tr. 171-77).

Plaintiff was in stable condition when seen following his mitral valve replacement on December 28, 1983 (Tr. 183).  Although he remained in atrial fibrillation, his heart rate was controlled at 88 beats per minute,[9] and he denied chest pain, dizziness and shortness of breath (*id.*).  He was instructed to continue taking Coumadin and Digoxin (*id.*).

On January 7, 1984, Plaintiff presented to military sick call with complaints of intermittent

---

[5]Atrial fibrillation is an arrhythmia, or abnormality of the heartbeat, which usually presents as a fast (greater than 100 beats per minute) and irregular heartbeat.  Atrial Fibrillation, *available at* http://www.emedicinehealth.com/Articles/10829-1.asp  (last updated August 24, 2005).  While patients can be asymptomatic, many experience a wide variety of symptoms, including palpitations, shortness of breath, fatigue, dizziness, chest pain, and congestive heart failure. *Id.*  In addition, atrial fibrillation can be associated with enlargement and weakening of the heart and blood clots. *Id.*

[6]Congestive heart failure is a clinical syndrome in which the heart fails to pump efficiently enough to adequately maintain blood circulation.  Congestive Heart Failure and Pulmonary Edema, *available at* http://www.emedicine.com/emerg/topic108.htm (last updated April 15, 2005).

[7]Coumadin is an anticoagulant medication used to prevent the blood clots that may be caused by atrial fibrillation.  Coumadin Oral, *available at* http://www.medscape.com/druginfo/dosage?drugid=4069&drugname= Coumadin+Oral&monotype=default&cid=med.

[8]Digoxin is a medication used to control the heart rate in patients with atrial fibrillation, specifically to maintain the heart rate between 60 and 100 beats per minute.  Digoxin Oral, *available at* http://www.medscape.com/druginfo/dosage?drugid=4358&drugname= Digoxin+Oral&monotype=default&cid=med.

[9]When atrial fibrillation is controlled, the heart rate is between 60 and 100 beats per minute.  Atrial Fibrillation, *available at* http://www.emedicinehealth.com/Articles/10829-1.asp  (last updated August 24, 2005).

left wrist swelling and tenderness  (Tr. 181-82).  Plaintiff  was diagnosed with possible rheumatoid arthritis and prescribed Motrin for treatment (*id.*).   At that time, Plaintiff remained in atrial fibrillation, but was asymptomatic (i.e., no chest pain, dizziness, fainting, etc.) (*id.*).  He returned for a follow up visit on January 30, 1984 (Tr. 182).  The wrist pain and swelling had decreased and Plaintiff was continued on Motrin (*id.*).

Plaintiff underwent exercise testing on January 9, 1984 and was noted to have poor exercise tolerance with a functional aerobic impairment of 42%[10] (Tr. 196).  He was prescribed an exercise regimen to increase his tolerance (*id.*).

Plaintiff appeared before the medical board for a second time on May 11, 1984 (Tr. 194-96).  At that point, his cardiac status was stable and his exercise tolerance had increased to the point that he was able to walk three miles per day without symptoms (*id.*).  His left wrist remained painful and swollen; however, no other joints were involved (Tr. 194).  The board recommended that Plaintiff continue on limited duty for an additional six months (Tr. 195).

Plaintiff again appeared before the medical review board on November 14, 1984 (Tr. 196-98).  At that time, he complained of decreased exercise capacity with bilateral leg weakness and shortness of breath, but denied difficulty breathing or debilitating shortness of breath on exertion (Tr. 196).  On physical examination, Plaintiff remained in atrial fibrillation, but his heart rate was controlled at 72 beats per minute (*id.*).  The swelling and tenderness of his left wrist were resolved (*id.*).  An echocardiogram was completed, which revealed marked left atrial enlargement (Tr. 197).  An exercise test was also performed,[11] and was discontinued due to fatigue, but Plaintiff's blood pressure was normal and he was without chest pain (*id.*).  The medical board found Plaintiff unfit for full duty.  At that time, Plaintiff was working as the supervisor of the Auto Hobby Shop and sought authorization to continue in that capacity (*id.*).  The staff cardiologist opined that Plaintiff could "perform in this capacity without difficulty"(*id.*).

---

[10]Functional aerobic impairment (FAI)  measures the difference between a person's aerobic capacity with that expected based on age, gender, and usual activity level.  A FAI of 42% is considered a moderate limitation.  Functional Aerobic Impairment, *available at* http://www.cebp.nl/media/m285.pdf.

[11]Plaintiff's functional aerobic impairment was 28%, which would be considered mild (Tr. 197).  Functional Aerobic Impairment, *available at* http://www.cebp.nl/media/m285.pdf.

In May 1985, Plaintiff underwent a synovectomy[12] of the left wrist for pain and swelling, which improved his symptoms for several months (Tr. 199).  In August 1985, he presented to a rheumatologist,  Lorraine Flatt, M.D., with complaints of recurrent pain and swelling (*id.*).  He also complained of intermittent pain in his ankles (*id.*).  He stated he had shortness of breath with activity, but denied chest pain and palpitations (Tr. 200).  No signs or symptoms of congestive heart failure were present (*id.*).  A physical examination revealed no signs of synovitis in any joints other than the left wrist (*id.*).  Plaintiff  had extensive synovial thickening of the left wrist with pain on movement, and x-rays revealed early erosive changes compatible with rheumatoid arthritis (*id.*).

On March 20, 1986, Plaintiff underwent an echocardiogram to assess his cardiac status (Tr. 295).  Plaintiff's replaced valve was working properly; however, his left atrium and ventricle were both enlarged and his left ventricular function was significantly diminished (*id.*).

Plaintiff again appeared before the medical review board on August 25, 1987 (Tr. 306).  He was attending school, but was not working (*id.*).  He continued to have complaints of tiredness and joint discomfort, and synovial thickening of his left wrist was noted (*id.*).  An electrocardiogram showed atrial fibrillation with a well-controlled ventricular response (*id.*).  The board recommended that Plaintiff be reevaluated in eighteen months (Tr. 308).

Throughout 1988, Plaintiff continued to treat with Dr. Flatt (Tr. 201-03).  At times he complained of problems with other joints, but Dr. Flatt documented that the only joint with synovitis was the left wrist (*id.*).

On February 26, 1990, Plaintiff underwent a left wrist arthrodesis[13] using a left iliac bone graft and excision of the distal ulna to treat his ongoing left wrist pain (Tr. 372-374).  At the time, Plaintiff was enrolled in vocational school to become an appliance mechanic (Tr. 372).  He complained of difficulty performing some of the tasks necessary for this position.  He was informed, however, that while the arthrodesis would decrease his pain, it might not help him functionally (*id.*).

---

[12]The synovium is the tissue that lines the joints.  Synovectomy for Rheumatoid Arthritis, *available at* http://my.webmd.com/hw/rheumatoid_arthritis/aa18893.asp (last updated August 27, 2004).  Synovitis is inflamation of this tissue, and a synovectomy is the removal of inflamed joint tissue.  *Id.*

[13] A wrist arthrodesis is the fusion of the wrist  joint.  Wrist Arthrodesis, *available at* http://www.emedicine.com/orthoped/topic367.htm (last updated July 23, 2004).

On June 5, 1990 one of Plaintiff's treating physicians, George H. Barbier, M.D., wrote a letter regarding Plaintiff's status (Tr. 377).   According to Dr. Barbier, Plaintiff had severe rheumatoid arthritis requiring a synovectomy in 1985 and a left wrist fusion in March 1990. Treatment of the rheumatoid arthritis was complicated by Plaintiff's requirement for chronic anticoagulation due to his mitral valve replacement secondary to rheumatic heart disease (*id.*).   In addition, Dr. Barbier wrote that Plaintiff had symptoms of dizziness, which were often related to his chronic atrial fibrillation (*id.*).   Dr. Barbier noted marked atrophy of the left upper extremity, probably related to Plaintiff's arthritis, but a subacute embolic cerebrovascular accident was also a possibility (*id.*).   According to Dr. Barbier, Plaintiff was "disabled with no hope of full range of motion of his left wrist.  His requirement for Digoxin and Coumadin . . ., [and his] atrial fibrillation and artificial heart valve would preclude him and limit him in most forms of employment" (*id.*).

On October 18, 1990, Plaintiff presented to the outpatient clinic at the Pensacola Naval Hospital for medication follow up and, at that time, had no cardiac related complaints (Tr. 533).

Plaintiff appeared before the medical review board again on November 29, 1990 (Tr. 540). He complained of severe swelling and pain in the left wrist at the arthrodesis site (*id.*).  He also complained of weakness and tiredness and stated he had chest pain whenever he was upset (*id.*). He reported that he was attending vocational school for parts marketing (*id.*).   A cardiovascular examination revealed the metallic S1 heart sound consistent with a functioning prosthetic heart valve (*id.*).  An echocardiogram showed left atrial enlargement with normal left ventricular function and a functioning prosthetic valve, and an electrocardiogram showed atrial fibrillation (Tr. 541). Plaintiff's wrist was swollen with no mobility due to the surgical fusion (Tr. 540).   It was recommended that Plaintiff be referred to a final physical evaluation board (Tr. 541).

Plaintiff began treating with Steven J. Schang, M.D., in April 1991, after the time period at issue in this case (Tr. 552).   He presented with complaints of intermittent generalized pain, sometimes in the joints and sometimes all over his body (*id.*).   Plaintiff further reported that occasionally his heart would beat fast for five to ten minutes at a time, but denied that lightheadedness, weakness or dizziness were associated with the increased heart rate (*id.*).  He stated that he would get dizzy when he stood suddenly from a squatting position (*id.*).   On physical examination, his heart rhythm was irregular, his heart rate was 76 beats per minute, his neck veins

were not distended and his chest was clear.  No mitral insufficiency murmur was heard (*id.*).  Dr. Schang detected no active joint disease and Plaintiff did not complain of any joint pain (*id.*).

When Plaintiff returned to Dr. Schang on August 28, 1991 for a checkup, Dr. Schang noted that he was doing "fairly well" and had "a little arthritis pain periodically which comes and goes in his wrists and in his knee" (Tr. 370).  His cardiac examination showed no mitral insufficiency and his valve clicks were crisp (*id.*).  At Plaintiff's request, Dr. Schang prescribed Tylenol #3 for pain (*id.*).

When Plaintiff returned to Dr. Schang for a three-month check up on November 26, 1991, Dr. Schang noted that he was doing "quite well," with no chest pain, weakness or shortness of breath (*id.*).  He had no mitral insufficiency and his vital signs were "excellent" (*id.*).  Dr. Schang also documented Plaintiff's report that "he [was] not able to work at the post office because they require him to lift 50 lbs. or more and when he tries to do this he gets a rushing of his heart" (*id.*).  Dr. Schang discouraged Plaintiff from restricting his activities and noted that he "[did not] think that there [was] any reason why he shouldn't lift that much" (*id.*).  Dr. Schang also noted that Plaintiff may be limited because he was a "small man without much muscle mass," but further documented that Plaintiff's "heart can stand it and this [was] re-emphasized to him" (*id.*).

On March 6, 1997, Dr. Schang wrote a letter stating that he had been following Plaintiff since April 1991 (Tr. 566).  He stated that Plaintiff had chest pain and chronic congestive symptoms for at least the previous eight years (*id.*).  He further stated he had evidence in his records that Plaintiff was disabled as early as December 31, 1990, having had cardiac valve surgery and joint problems in the 1980's (*id.*).

C.      Other information within Plaintiff's Claims File

Plaintiff was seen by consulting physician Richard W. Lucey, M.D., on July 21, 1989 (Tr. 339).  Plaintiff told Dr. Lucey he had a lack of endurance and experienced shortness of breath with lifting more than ten to fifteen pounds or with walking more than 500 yards (*id.*).  He denied chest pain, but stated that he must either slow down or sit and rest at times (*id.*).  Plaintiff also complained of pain in his neck and shoulders, and pain and stiffness on a regular basis in his arms, hands and feet (Tr. 340).

On physical examination Dr. Lucey noted full range of motion in the lower extremities,

shoulders and arms (Tr. 341).  The right hand exhibited mild joint deformity at the base of the thumb only, and the left wrist was limited significantly in range of motion[14] (*id.*).  Some muscle atrophy was present below the left elbow extending to the hand, and the left hand exhibited marked atrophy with decreased grip strength (*id.*).  Dr. Lucey's assessment was: 1) status post mitral valve replacement; 2) probable atrial fibrillation; and 3) rheumatoid arthritis primarily involving the left hand and wrist, with early involvement of the right wrist, right thumb and feet (Tr. 342).  According to Dr. Lucey, Plaintiff was "essentially limited to very light physical activities which do not involve prolonged walking, certainly no climbing and also do not require a good deal of fine manipulatory movements" (*id.*).

Plaintiff was also evaluated by consulting physician Gary Gotthelf, M.D., on November 14, 1989 (Tr. 343-44).  Plaintiff complained of generalized weakness and fatigue; occasional dizziness and palpitations; morning stiffness; and bilateral hand, knee and ankle pain, with his left wrist being the worst (Tr. 343).  On physical examination, all joints revealed normal ranges of motion, with the exception of the left wrist where the range of motion was markedly decreased (Tr. 344).  Dr. Gotthelf also noted obvious atrophy of the left hand muscles as well as in the left biceps and deltoid muscles (*id.*).  Plaintiff had decreased strength (three on a scale of five) in his left biceps, triceps and hand (*id.*).  Dr. Gotthelf concluded that Plaintiff was status post mitral valve replacement and continued to have some shortness of breath and dizziness from his chronic problems (*id.*).  He also found that Plaintiff had rheumatoid arthritis with marked atrophy of the left upper extremity, associated with either rheumatoid arthritis or a subacute embolic cerebrovascular accident (*id.*).  "All in all, [Dr. Gotthelf felt] the patient [was] disabled" (*id.*).

On March 7, 1997, Plaintiff's medical records were sent to Jeffrey Kessler, M.D., for a medical assessment regarding the July 25, 1990 to December 31, 1990 time frame (Tr. 559).  In Dr. Kessler's opinion, Plaintiff was able to perform at a light level of exertion as of December 31, 1990, but did have limited use of his left wrist secondary to a fusion, swelling and pain (Tr. 560).  According to Dr. Kessler, Plaintiff's symptoms of dizziness and fatigue could not be explained by objective medical findings, as his atrial fibrillation was well-controlled with medication and he was

---

[14]Dr. Lucey documented that the right wrist had limited range of motion; however, based on the remainder of the medical records, it appears he intended to refer to the left wrist.

not anemic (*id.*).  In Dr. Kessler's opinion, those symptoms may have resulted from his relative inactivity during this time frame, which led to total deconditioning (*id.*).  Dr. Kessler completed a *Medical Assessment of Ability to Do Work-Related Activities* form regarding Plaintiff's abilities as of December 31, 1990 (Tr. 561-65).  He found that Plaintiff's lifting/carrying ability was affected by rheumatoid arthritis of the left wrist with arthrodesis and evidence of some muscle atrophy of the left upper extremity, and by his mitral valve replacement with compensated atrial fibrillation (Tr. 561).  He found that Plaintiff could lift twenty pounds occasionally and ten pounds frequently (*id.*). His standing/walking and sitting abilities were not impaired because his atrial fibrillation was controlled (*id.*).  Plaintiff could not climb or balance, but was able to occasionally crouch, kneel, and crawl (*id.*).  Handling and pushing/pulling with the left wrist/hand were affected by the impairment and could only be done occasionally (Tr. 563).  Plaintiff could never work around heights or moving machinery due to dizziness and should avoid concentrated fume exposure (*id.*).  In conclusion, Dr. Kessler stated that Plaintiff's atrial fibrillation was well-controlled, no evidence of tachyarrhythmia or congestive heart failure existed, and an echocardiogram showed normal left ventricular function with an excellent ejection fraction (Tr. 564).  Additionally, the prosthetic valve was functioning and there was no evidence of regurgitation (Tr. 565).  In Dr. Kessler's opinion, the combination of Plaintiff's impairments resulted in an ability to perform work at a light level of exertion with further restrictions on the left wrist (*id.*).[15]

V.     DISCUSSION

Plaintiff contends the ALJ erred in finding that Plaintiff retained the RFC to perform light work,[16] arguing that the "evidence of record simply does not support [the ALJ's] residual functional capacity assessment" (Doc. 11 at 7).  Specifically, Plaintiff contends that in making the RFC

_____

[15]Dr. Kessler stated that Plaintiff's impairments resulted "in a MSS for a <u>light</u> level of exertion . . ." (Tr. 565). Based upon the context of this statement, it appears that "MSS" refers to Plaintiff's ability to perform work.

[16]The C.F.R. provides:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

determination, the ALJ erroneously rejected the opinion of Plaintiff's treating physicians, gave controlling weight to the opinion of a non-examining reviewing physician, and posed a flawed hypothetical question to the VE (Doc. 11).  Plaintiff also suggests that the ALJ erroneously found that Plaintiff's subjective complaints were not fully credible (*id.*).  Defendant maintains that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff was not disabled within the meaning of the Social Security Act (Doc. 13).

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.  *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the RFC determination is a medical question, it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.  This court concludes that the ALJ made a proper RFC determination, and did so based on all of the relevant and credible evidence of record.

A.    Medical Opinions

Plaintiff contends that the ALJ improperly rejected the opinions of treating physicians Schang and Gotthelf that Plaintiff was "disabled"; improperly rejected the opinion of consulting physician Lucey that Plaintiff was limited to very light physical activities that do not involve prolonged walking; and improperly gave controlling weight to the opinion of non-examining, reviewing physician Kessler that Plaintiff was capable of a limited range of light duty work during the relevant time period.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d at 1439 - 1441; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the

Commissioner.  20 C.F.R. § 404.1527(e).

In this case, the ALJ considered the opinions of two of Plaintiff's treating physicians, Dr. Schang and Dr. Barbier; two consulting, examining physicians, Dr. Lucey and Dr. Gotthelf; and one consulting, non-examining physician, Dr. Kessler.

The ALJ properly considered and discounted Dr. Schang's opinion, noting that Dr. Schang's medical records are internally inconsistent (*see* Tr. 602-03).  In a 1997 letter, Dr. Schang wrote that Plaintiff had chest pain and chronic congestive heart failure symptoms for at least eight years, or since 1989, and concluded that Plaintiff was "disabled as of December 31, 1990" (Tr. 566). However, other information in Dr. Schang's medical records contradicts these statements.  As noted by the ALJ, Plaintiff did not begin treating with Dr. Schang until April 1991 (*see* Tr. 566, 602), after the relevant time period (July 26, 1990 to December 31, 1990).  When Plaintiff first presented to Dr. Schang in April 1991, he did not have any active joint disease (Tr. 552), his atrial fibrillation was controlled, and he had no significant symptoms related to the atrial fibrillation such as dizziness or syncope.  Further, according to Dr. Schang's documentation, Plaintiff did not have any symptoms of congestive heart failure, and Dr. Schang's charting throughout the remainder of 1991 documents that Plaintiff was doing well.  For example, Dr. Schang's records from November 1991 reflect that Plaintiff's vital signs were "excellent" and there was no reason, other than Plaintiff being a small individual, that he could not work at the Post Office and lift fifty pounds (Tr. 370).  *See* 20 C.F.R.§ 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  "Where other medical assessments are supported by better or more thorough medical evidence," an ALJ may "discount or even disregard the opinion of a treating physician."  *See* Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (citations and internal punctuation omitted).  Because Dr. Schang's finding of disability was inconsistent with his own records and with the record as a whole, it was properly discounted by the ALJ.

The ALJ also properly considered and discounted Dr. Barbier's opinions.  As noted by the ALJ, in June 1990 Dr. Barbier wrote a letter noting Plaintiff's history of arthritis, with left upper extremity atrophy, and his mitral valve replacement, with ongoing anticoagulation therapy.  He then concluded that Plaintiff was disabled, but inconsistently stated that his problems only "limit him in *most* forms of employment" (i.e., some work was available Plaintiff could perform) (*see* Tr. 377,

603) (emphasis added).  Further, Dr. Barbier did not document specific clinical or objective findings to support his opinion that Plaintiff was disabled.  A treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory (*see* 20 C.F.R. § 404.1527(d)).  A brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *See* Johns v. Bowen, 821 F.2d 551, 555 (11th Cir. 1987).  Therefore, Dr. Barbier's opinion was properly discounted.

Plaintiff points out that in addition to two treating physicians stating he was disabled, a consulting physician, Dr. Gotthelf, also concluded he was disabled.  However, as a one-time consultative examiner, Dr. Gotthelf's opinion is not entitled to deference.  *See* McSwain v. Bowen, 814 F.2d 617,619 (11th Cir. 1987) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)). Moreover, the ALJ considered Dr. Gotthelf's opinion and discussed his reasons for giving insignificant weight to it (*see* Tr. 603-04).  The ALJ noted Dr. Gotthelf's observation of full ranges of motion in Plaintiff's shoulders, elbows, right wrist, hips, knees, ankles and toes, and a decreased range of motion only in Plaintiff's left wrist (Tr. 603-04).  The ALJ further discussed Dr. Gotthelf's finding of full motor strength of all muscle groups, except in Plaintiff's left biceps, triceps and hand, which were atrophied (*see* Tr. 343-44; 603-09), and correctly noted that Dr. Gotthelf's opinion appears to be based partly upon Plaintiff's subjective complaints (*id.*, Tr. 343-44).  Additionally, Dr. Gotthelf merely noted Plaintiff's history of valve replacement, arthritis, and Plaintiff's subjective complaints of "some dyspnea and dizziness" (*see* Tr. 344).  He provided no objective or clinical findings in support of his conclusion that Plaintiff was disabled.  Finally, Dr. Gotthelf saw Plaintiff on only one occasion in November 1989, prior to the time frame relevant to this claim.  For the foregoing reasons, Dr. Gotthelf's "disability" opinion was properly discounted by the ALJ.

Furthermore, it was proper for the ALJ to discount Dr. Schang's, Dr. Barbier's, and Dr. Gotthelf's conclusions that Plaintiff was disabled because the question of whether a claimant is disabled (i.e., unable to work within the strictures of the Social Security Act) is reserved to the Commissioner, not to a physician.  *See* 20 C.F.R. § 404.1503.  It is the physician's evaluation of a Plaintiff's condition and the medical consequences thereof, "not their opinions of the legal consequences of his condition" on which the court must focus.  Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997).

Plaintiff also argues that the evidence does not support the ALJ's residual functional capacity assessment because Dr. Lucey opined that Plaintiff was limited to very light physical activities that did not involve any prolonged walking.  Dr. Lucey, a one-time consulting examiner who examined Plaintiff in July 1989, documented that Plaintiff complained of a lack of endurance and shortness of breath with activity such as lifting ten to fifteen pounds or walking more than 500 yards (Tr. 339-40).  However, other than some left upper extremity muscle atrophy and limited range of motion in Plaintiff's left wrist, his physical examination was generally unremarkable (*see* Tr. 341).  As noted by the ALJ:

> Dr. Lucey's findings included no significant spinal or lower extremity abnormalities, no loss of shoulder or elbow motions, and no loss of right hand motion.  Grip strength on the right was full, although it was diminished on the left.  Neurologic findings were benign . . . Dr. Lucey considered the claimant capable of performing "very light" physical activities, provided he avoid prolonged waking. [He] did not provide further or specific functional limitations.

(Tr. 604).  Dr. Lucey noted no physical limitations or objective cardiac findings that would restrict or limit Plaintiff's ability to walk, and it appears that he based his opinion regarding the appropriate level of activity for Plaintiff solely on Plaintiff's subjective complaints.  As discussed more fully below, the ALJ properly discounted Plaintiff's subjective complaints, as they were uncorroborated by medical evidence.  Furthermore, Dr. Lucey's conclusions are not necessarily inconsistent with the ALJ's conclusion that Plaintiff was capable of performing "light work."  As described in footnote sixteen, above, light work can involve "sitting most of the time" and/or lifting or carrying of objects weighing up to ten pounds.  *See* 20 C.F.R. § 404.1567(b).  Furthermore, the "light work" jobs available for Plaintiff, per the VE, included gate guard, mailroom clerk and collator operator (Tr. 606), jobs that Plaintiff appeared capable of performing during the time period in question even if Dr. Lucey's limitations were fully considered.

The ALJ also considered the opinion of Dr. Kessler, a state agency chief medical officer (Tr. 604).  Dr. Kessler reviewed Plaintiff's medical records and opined that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally; had no limitations on his capacity for sitting, standing, or walking; could kneel, crouch, and crawl occasionally; had limited use of his left upper extremity; and was precluded from work involving unprotected heights, moving machinery, fumes, climbing, and balancing (*see* Tr. 561-63).  Dr. Kessler explained that his opinion was based on the

fact that Plaintiff's atrial fibrillation was well-controlled, his prosthetic valve was functioning well, there was no evidence of congestive heart failure, and an echocardiogram showed normal left ventricular function with an excellent ejection fraction (Tr. 564).   Dr. Kessler's opinion was supported by medical evidence and consistent with the record as a whole; therefore, it was properly considered by the ALJ.  *See also* <u>Cantrell</u>, 231 F.3d at 1107 (proper to consider consulting physician's opinion over that of treating physician in some circumstances).

Although evidence in the record arguably exists to support a decision contrary to that reached by the ALJ, this court is limited in its inquiry and is not empowered to reweigh the evidence.  *See generally* <u>Martin</u>, 894 F.2d at 1529 (the reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner); <u>Sewell</u> 792 F.2d at 1067 (even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence).  For the foregoing reasons, the undersigned concludes the ALJ properly considered the opinions of the treating and consulting physicians, and substantial evidence in the record supports the ALJ's residual functional capacity conclusion.

B.      The Eleventh Circuit Pain Standard and Evaluation of Plaintiff's Credibility

Plaintiff contends that the ALJ improperly discounted Plaintiff's subjective complaints.  As this court is well aware, pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the <u>Hand</u> test.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219 (11th Cir. 2002); <u>Kelley v. Apfel</u>, 173 F.3d 814 (11th Cir. 1999); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216 (11th Cir. 1991); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Martin v. Railroad Retirement Bd.</u>, 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision . . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective

symptoms and complaints").[17]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

The ALJ found that Plaintiff's allegations regarding his limitations were not totally credible (Tr. 607).  The ALJ may properly find subjective complaints not credible if he articulates reasons that are supported by the record.  See Jones v. Dept. of HHS, 941 F.2d 1529 (11th Cir. 1991).  Here, the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's complaints. Specifically, the ALJ noted that claimant's Disability Report from January 1995, more than four years beyond the time period at issue, showed Plaintiff's acknowledgment of engaging in activities such as cooking, light cleaning, and gardening (Tr. 604, 441, 449).  The ALJ also noted Plaintiff's hearing testimony from June 1990, which included acknowledgments of attending school five hours per day, driving, watching television, reading and taking walks in the yard (Tr. 604), which was consistent with Plaintiff's report in November 1990 that he was attending vocational school for parts marketing (Tr. 604, 540).  The ALJ found the ability to perform these activities, along with Dr. Schang's opinion that Plaintiff could lift fifty pounds, inconsistent with Plaintiff's claims of an inability to work (Tr. 605).  The ALJ further noted that in April 1991, Dr. Schang documented that Plaintiff had only generalized and intermittent joint pain and pointed out that the presence of a "slipped disc" was not documented in the medical evidence until several years after the time period

_____

[17]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

at issue (*id.*).  Finally, the ALJ correctly noted that Plaintiff's alleged need to lay down due to dizziness was uncorroborated by medical evidence through December 1990 (*id.*).  Accordingly, the ALJ properly discounted Plaintiff's subjective complaints and articulated sufficient reasons, supported by the record, for doing so.

      C.      Hypothetical Question

Plaintiff contends the ALJ presented the VE with a flawed hypothetical question.  The ALJ asked the VE to assume that Plaintiff was limited to a range of light work; could not work around heights, fumes, or moving machinery; could not balance or climb; and could do no more than occasional handling or pushing/pulling with his left hand due to a left wrist fusion (Tr. 642-43).  Based upon these limitations and considering Plaintiff's age, education, and non-exertional restrictions, the VE opined that Plaintiff could perform jobs existing in the general region where Plaintiff lived and in several regions of the country (Tr. 643).  Examples provided by the VE included gate guard, collator operator and mailroom clerk,[18] which were light exertional level jobs (*id.*).

The ALJ also asked the VE if her opinion would be affected if Plaintiff's "residual functional capacity [was reduced] to sedentary and left everything else the same" (*id.*).  In response, the VE opined that none of the three positions could be performed "under sedentary" (Tr. 643), however Plaintiff could perform the job of  surveillance system monitor and there were 350 such jobs in Florida and 5,460 in the nation (Tr. 643-44).  Considering Plaintiff's ability to only occasionally handle or grasp things with his left hand, the VE testified that the collator job would probably not be affected, but the number of mailroom jobs would be reduced by half (Tr. 646-47).

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."  *Id.*  Plaintiff contends the ALJ's questioning was flawed because the questions depended upon an ability to perform light work.  However, as explained above, the ALJ's finding

---

[18]The VE testified that in Florida there were 23,236 gate guard positions, 3, 129 mail clerk positions and 1,160 collator operator positions.

that Plaintiff could perform light work was supported by substantial evidence in the record.  Thus, the ALJ's hypothetical question accurately and comprehensively described Plaintiff's condition and was therefore proper.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this <u>30th</u> day of September 2005.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**